776 F.2d 455
 19 Fed. R. Evid. Serv. 1000
 UNITED STATES of America, Appellee,
v.
Thomas Calvin RICKS, a/k/a Joe Dancer, Appellant.
UNITED STATES of America, Appellee,
v.
James A. CARTER, Appellant.
UNITED STATES of America, Appellee,
v.
Marcell MOFFATT, a/k/a Black Barney, Appellant.
UNITED STATES of America, Appellee,
v.
Stanley RODGERS, Appellant.
UNITED STATES of America, Appellee,
v.
Kerney William LINDSEY, a/k/a Wilco, Appellant.
UNITED STATES of America, Appellee,
v.
Clifton Leo FRISBY, Appellant.
UNITED STATES of America, Appellee,
v.
Beatrice ROBERTS, Appellant.
UNITED STATES of America, Appellee,
v.
Maurice David KING, a/k/a Peanut, Appellant.
 Nos. 83-5060(L), 83-5061 through 83-5066 and 83-5081.
 United States Court of Appeals,
Fourth Circuit.
 Argued May 6, 1985.
Decided Oct. 10, 1985.
 
 Ransom J. Davis, Stuart R. Blatt, Baltimore, Md., W. Gary Kohlman, Washington, D.C., Charles Lee Nutt, William H. Murphy, Baltimore, Md. (H. Russell Smouse, Harry J. Matz, Melnicove, Kaufman, Weiner & Smouse, P.A., Baltimore, Md.; Kenneth Michael Robinson, Washington, D.C., Edward Smith, Jr., Cummings & Smith, P.A., Jack Rubin, Baltimore, Md., on brief), for appellants.
 J. Frederick Motz, U.S. Atty., Baltimore, Md., for appellee.
 Before WINTER, Chief Judge, WILKINSON, Circuit Judge, and TURK, Chief District Judge, United States District Court for the Western District of Virginia, sitting by designation.
 HARRISON L. WINTER, Chief Judge:
 
 
 1
 Eight defendants convicted by a jury of a variety of narcotic offenses appeal assigning divers reasons why the judgments of their convictions should be set aside. We perceive as a basic error in their trials the effective denial of their statutory right to peremptory challenges in the selection of the jury. This error is sufficient to require reversals and a new trial. We decide the case solely on this ground, although we comment on defendants' other contentions which relate to issues that are bound to arise on retrial.I.
 
 
 2
 Defendants Ricks, Carter, Moffatt, Rogers, Lindsey, Frisby, Roberts and King were all convicted of engaging in a conspiracy to possess and distribute heroin and cocaine in violation of 21 U.S.C. Sec. 846. King and Ricks, two of the leaders of the conspiracy, were also convicted of other related substantive offenses, of conducting a continuing criminal enterprise in violation of 21 U.S.C. Sec. 848, and of violation of the Travel Act, 18 U.S.C. Sec. 1952.[1] The case, which took five weeks to try, arose from the operation of a major drug distribution organization in Baltimore City. Defendants King, Ricks and Meredith were the heads of the organization; defendant Carter the financial advisor; defendants Moffatt, Lindsey and Hurt were lieutenants of certain inner city street corners where drugs were sold; defendant Frisby was a sublieutenant and distributor; defendant Rogers was a courier of drugs and money; and defendant Roberts was the girlfriend of Ricks who allowed her apartment to be used for illegal purposes and who otherwise assisted in the operation.
 
 
 3
 Our statement of facts is limited by the basis on which we decide the case and further limited to the recurrent issues that we think warrant comment.
 
 II.
 
 4
 When the trial of the nine defendants began, they, of course, together with the government, had a statutory right to peremptory challenges in the jury selection process. Since the offenses charged were punishable by imprisonment for more than one year, Fed.R.Crim.P. 24(b) provided that the government was entitled to six peremptory challenges and the defendants jointly to no less than ten peremptory challenges. The rule provides that where "there is more than one defendant, the court may allow the defendants additional peremptory challenges and permit them to be exercised separately or jointly." The rule also provides that defendants and the government are entitled to additional peremptory strikes if alternate jurors are used--one challenge for up to two alternate jurors and two challenges for up to four alternate jurors. Fed.R.Crim.P. 24(c).
 
 
 5
 The district court granted defendants jointly twelve peremptory challenges for the main jury,[2] with six for the government. The district court concluded to use four alternate jurors, and it granted defendants jointly and the government each two peremptory challenges exercisable against the alternates.[3]
 
 
 6
 Seventy-five veniremen reported for jury duty on the day that defendants' trial began. The seventy-five were ultimately divided into two groups--a group of sixty-six from which active jurors in this case were to be chosen and a group of nine from which alternate jurors were to be chosen. The record suggests that such a large number was brought in because one or more other district judges would select juries from the pool once the jury in defendants' case had been selected.[4]
 
 
 7
 Before voir dire began, an Assistant United States Attorney inquired of the court about the portion of the list that the court contemplated using in drawing a jury. The inquiry was apparently generated by the unusually large list of veniremen. The actual inquiry and the court's response follow:
 
 
 8
 MR. ULWICK: Your Honor, may I assume that we'll be--or the Court will be picking from the top of the list?
 
 
 9
 THE COURT: Well, of course I can't tell at this point, as far as strikes and so forth, but ordinarily I start from the top, not any rigid number, counting from the top, so I think it would be reasonably fair to say, if you want to exercise your strikes mostly at the top, and if you're satisfied with the top, don't strike there.[5]
 
 
 10
 In the course of voir dire, nine veniremen on the active list and one venireman on the alternate list were excused for cause, leaving fifty-seven on the list from which active jurors would be selected and eight on the alternate list. Copies of the list of fifty-seven and eight, respectively, were furnished counsel so that they could mark their peremptory strikes.
 
 
 11
 Defendants exercised their peremptory challenges all within the first twenty-seven veniremen who had not been excused for cause. The government exercised three of its peremptory challenges within the first twenty-nine veniremen who had not been excused for cause; one within the next thirteen from which the jury was chosen; and two within the remaining jurors who were not used. The district court, having been furnished a list of the entire venire with absences, excuses for cause, and peremptory strikes shown thereon, selected as foreman the fifteenth on the list of veniremen present who had neither been stricken nor excused for cause. The foreman appeared on the list below defendants' exercise of their strikes, and the remaining regular jurors were drawn from the list below the placement of the foreman. Thus, of the fifty-seven eligible veniremen, the jury actually picked came from numbers thirty through forty-two.
 
 
 12
 As soon as the jury was seated and before it was sworn, defendants realized that they had concentrated the use of their peremptory strikes in an area of the list ahead of the portion from which the active jurors were chosen. They immediately objected, asserting "[w]e relied on the Court's statement that it was going to start from the top of the list. We feel as though we have been led astray." The response of the court was that "I didn't say I was going to strike starting from the top, if that's the question. I said not necessarily."
 
 
 13
 There ensued an extended dialogue between the court and counsel--counsel for defendants steadfastly maintaining that they had concentrated their strikes in the portion of the list from which they thought the jury would be chosen based upon their understanding that the jury would be selected from the top.[6] Counsel identified at least two jurors seated in the box as ones they would have stricken had they thought that these veniremen would have been eligible to be chosen.[7] The court required the reporter to read back the court's original statement about how the jury would be drawn, and then the court explained its comments as follows:
 
 
 14
 So what I said was, exercise most of them from the top, but it wasn't any rigid formula. If it had been a rigid formula, I would have given you 30 and we'd put them in the box and we'd say strike each particular one here and we've ended up, I think, with 64 on the list, and there's no telling where the strikes would be.
 
 
 15
 The government, in this colloquy, pointed out that it had understood the court correctly and it had spread its strikes throughout the entire list, even though it used half of them at the top. Counsel for defendants rejoined that it was bound to be something more than coincidence that nine defense attorneys understood that they should limit their strikes to the portion of the list counting from the top from which it was mathematically likely that the active jurors would be chosen. The district court formally overruled the objection to the array, delivering the short oral opinion set forth below.[8] The veniremen seated in the box and the alternates were sworn as jurors, and the veniremen remaining in the courtroom were returned to the jury assembly room.
 
 III.
 
 16
 Much of the argument before us is centered on the assertion and counter-assertion that the district court did or did not positively tell counsel that it would select active jurors from the top of the list. We do not find it necessary to resolve this factual question. Certainly we do not think that the district court purposely misled defendants' counsel; defendants' counsel does not even suggest this argument. Similarly, we have no basis in the record to question the bona fides of defendants' counsel. After examining the language used, we do not think that, based upon what the district court said, it was unreasonable for defendants' counsel to interpret the court's remarks to mean that the jury would be selected largely or substantially from the top of the list. Further, we think that it was not unreasonable for defense counsel to have enough certainty in their interpretation of the court's remarks to negate any duty on their part to make a further inquiry or to request clarification.
 
 
 17
 The practical effect of defendants' counsels' not unreasonable belief that the jury would be chosen largely or substantially from the top of the list was to frustrate the exercise of their peremptory strikes. In effect, their strikes were worthless because they were all exercised with respect to veniremen who were not considered for selection as jurors.
 
 
 18
 The right to peremptory strikes is not a constitutional one. It was formerly a right created by statute alone, and it is presently a right created by rule of court with legislative sanction. But it is a right of such significance that denial or substantial impairment of the right constitutes per se reversible error. As authority for the latter statement, we need look only to Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), and the authorities on which it relied. Swain was a case in which a black defendant convicted by an all-white jury sought a reversal of his conviction on the ground that he had been denied equal protection of the laws by racially discriminatory jury selection procedures, including discrimination in the use of the peremptory strike system. The accused did not prevail in his arguments, but in the opinion of the Court dealing with the use and function of peremptory strikes, we find stated the principles which govern the decision in our case. It is necessary that we quote at some length:
 
 
 19
 In contrast to the course in England, where both peremptory challenge and challenge for cause have fallen into disuse, peremptories were and are freely used and relied upon in this country, perhaps because juries here are drawn from a greater cross-section of a heterogeneous society. The voir dire in American trials tend to be extensive and probing, operating as a predicate for the exercise of peremptories, and the process of selecting a jury protracted. The persistence of peremptories and their extensive use demonstrate the long and widely held belief that peremptory challenge is a necessary part of trial by jury. See Lewis v. United States, 146 U.S. 370, 376, 36 L.Ed. 1011, 1014, 13 S.Ct. 136 . Although "[t]here is nothing in the Constitution of the United States which requires the Congress [or the States] grant peremptory challenges," Stilson v. United States, 250 U.S. 583, 586, 63 L.Ed. 1154, 1156, 40 S.Ct. 28 , nonetheless the challenge is "one of the most important of the rights secured to the accused," Pointer v. United States, 151 U.S. 396, 408, 38 L.Ed. 208, 214, 14 S.Ct. 410 . The denial or impairment of the right is reversible error without a showing of prejudice, Lewis v. United States, 146 U.S. 370, 36 L.Ed. 1011, 13 S.Ct. 136; Harrison v. United States, 163 U.S. 140, 41 L.Ed. 104, 16 S.Ct. 961; cf. Gulf, Colorado & Santa Fe R. Co. v. Shane, 157 U.S. 348, 39 L.Ed. 727, 15 S.Ct. 641. "For it is, as Blackstone says, an arbitrary and capricious right; and it must be exercised with full freedom, or it fails of its full purpose." Lewis v. United States, 146 U.S. 370, 378, 36 L.Ed. 1011, 1014, 13 S.Ct. 136 .
 
 
 20
 380 U.S. at 218-19, 85 S.Ct. at 835 (footnotes omitted; emphasis added).
 
 
 21
 Since we read Swain and Pointer v. United States, 151 U.S. 396, 408, 14 S.Ct. 410, 414, 38 L.Ed. 208 (1894), to say that the denial or impairment of the right to peremptory strikes is reversible error per se, and since we conclude that defendants' right in this case was effectively, albeit inadvertently, denied, we must reverse the convictions and grant a new trial.[9]IV.
 
 
 22
 Defendants Ricks and King were charged and convicted jointly of interstate travel in aid of racketeering (18 U.S.C. Sec. 1952), conspiracy to possess and distribute narcotics (21 U.S.C. Sec. 846), and conducting a continuing criminal enterprise (21 U.S.C. Sec. 848). King was also charged and convicted of two substantive distribution offenses in violation of 21 U.S.C. Sec. 841 and 18 U.S.C. Sec. 2, and Ricks was indicted and convicted of three separate distribution offenses in violation of those same statutes. They[10] challenge their continuing criminal enterprise (CCE) convictions under 21 U.S.C. Sec. 848 because they believe the jury was erroneously instructed that the lesser included Sec. 846 conspiracy could serve as a predicate offense for the CCE charge.
 
 
 23
 Some of defendants' cumulative convictions and sentences were clearly improper at the time they were imposed, because our cases had established, in harmony with numerous cases from other circuits, that Secs. 846 and 841 specified lesser included offenses under Sec. 848, and that separate convictions and punishments could not be imposed for the greater and lesser offenses. See United States v. Leifried, 732 F.2d 388 (4 Cir.1984); United States v. Raimondo, 721 F.2d 476 (4 Cir.1983), cert. denied, --- U.S. ----, 105 S.Ct. 133, 83 L.Ed.2d 74 (1984); United States v. Lurz, 666 F.2d 69, 75 (4 Cir.1981), cert. denied, 459 U.S. 843, 103 S.Ct. 95, 74 L.Ed.2d 87 (1982); United States v. Webster, 639 F.2d 174, 182 (4 Cir.1981). These conclusions may remain true with respect to cumulative sentencing for Secs. 846 and 848,[11] but the Supreme Court's recent opinion in Garrett v. United States, --- U.S. ----, 105 S.Ct. 2407, 85 L.Ed.2d 764 (1985), holds that separate prosecutions and punishments are permissible for Sec. 848 and the underlying substantive predicate offenses. Although that case did not involve a Sec. 841 conviction, we think that its holding applies to that section as well.[12] In any event, because we vacate defendants' convictions on other grounds and we assume that all charges against each defendant will be retried together, we have no occasion to explore the full ramifications of Garrett as it relates to Ricks' and King's sentences.
 
 
 24
 We must decide, however, whether the government sufficiently proved all the elements of the CCE charges against King and Ricks; if not, they are entitled to acquittal rather than merely a retrial on those charges. We think that the evidence was more than adequate to prove all of the elements of a Sec. 848 violation that were charged, see generally Lurz, supra, 666 F.2d at 75-76, but we must decide what offenses may be used as predicates for the CCE violation. Several propositions that we accept as settled guide our resolution of this issue: (1) 21 U.S.C. Sec. 848(b)(2)'s requirement of "a continuing series of violations" requires at least three violations;[13] (2) since Sec. 848(b) refers to "violations of this subchapter or subchapter II of this chapter [21 U.S.C. Secs. 801-966]," violations of 18 U.S.C. Secs. 2 and 1952 do not qualify as predicate felonies for a CCE charge;[14] and (3) violations of Sec. 841 may serve as predicate offenses and as the necessary three violations for a series.[15]
 
 
 25
 Ricks thus has no valid argument against retrial, because he was convicted of three violations of Sec. 841 (counts 6, 7, and 8). King, however, was charged and convicted of only two violations of Sec. 841 (counts 10 and 11), and his conviction under 18 U.S.C. Sec. 1952 (count 3) does not qualify under Sec. 848. His conviction under Sec. 848 would thus be invalid if we were persuaded that the Sec. 846 conspiracy conviction may not serve as one of the three requisite narcotics violations,[16] and that the government did not, or was not legally entitled to, prove some other qualifying violation that was not charged as a separate offense in the indictment.[17] Since King did not object at trial on these grounds, and thus preserve the point for appeal, we need not resolve the merits of his possible arguments; we hold only that the district court committed no plain error in overlooking or implicitly rejecting these two points, and thus King's retrial is not barred.
 
 V.
 
 26
 Defendants' other assignments of reversible error merit only summary treatment.
 
 
 27
 A. We think that the evidence was legally sufficient to convict each defendant of the crime or crimes with which he or she was charged. There is thus no defendant ineligible for retrial.
 
 
 28
 B. We see no error in the district court's denial of the motions of defendants Carter, Roberts and Lindsey for a severance. The bases for their motions simply did not meet the criteria of United States v. Parodi, 703 F.2d 768 (4 Cir.1983), especially because the lateness of the filing by Carter of his affidavits prevented an effective inquiry into whether all of the criteria were met. Since there must be a retrial, Carter's motion may be considered further by the district court if Carter continues to press it.
 
 
 29
 C. We think that the evidence was legally sufficient to permit the jury to conclude beyond a reasonable doubt that defendant Ricks was not entrapped into providing drugs to Smith, the police informant; nor do we think that Smith's efforts, at the behest of law officers, to obtain other drugs from Ricks constituted overreaching by the government and denied due process of law. Ricks' other attacks on the sufficiency of the proof to convict him are lacking in merit as we have previously stated.
 
 
 30
 D. We are of the opinion that the warrants authorizing the search of Carter's residence and his safe deposit box were issued on a proper showing of probable cause, and the searches and related seizures of evidence used at the trial were valid and not offensive to the Fourth Amendment. Similarly, we think that there was probable cause for the search of the apartment residence of Ricks and Roberts and although a warrant had not issued for the search, there were exigent circumstances for the search excusing the necessity of the warrant. See United States v. Turner, 650 F.2d 526 (4 Cir.1981).
 
 
 31
 E. As part of the government's case, it undertook to prove that trial counsel for Ricks had been paid $21,750 in cash by King, Ricks and Meredith over a four-year period to represent members of their drug distribution network when those members were arrested on narcotics charges. Such proof was highly relevant to the status of Ricks and King as organizers or managers of a criminal enterprise because it would show their payment of fees for underlings who were in trouble. The attorney had been subpoenaed to appear before the grand jury but he was successful in avoiding an actual appearance and submitting only a written summary of his testimony.
 
 
 32
 The government proposed to present this evidence at trial by a stipulation that avoided disclosure of the attorney's name. All defendants agreed but when the stipulation was offered, King objected on the grounds that his attorney-client privilege would be violated and that the stipulation was inadmissible hearsay and if received would violate his rights of cross-examination and confrontation. The district court concluded to admit the stipulation but to afford King the opportunity to call the lawyer and to examine him about matters relating to the stipulation. King did not avail himself of that right.
 
 
 33
 Before us, King renews the arguments he made in the district court, and Ricks also contends that his conviction should be reversed because his lawyer was a damaging witness against him and he never validly waived the conflict of interest. We are not persuaded by these contentions.
 
 
 34
 First, we do not think that King's attorney-client privilege extended to the information that was proved. We stated in United States v. (Under Seal), 748 F.2d 871, 874 (4 Cir.1984), that the privilege "protects only confidential client communications; that is, communications not intended to be disclosed to third persons other than in the course of rendering legal services to the client or transmitting the communications by reasonably necessary means," relying upon our prior holdings such as In re Grand Jury Proceedings (John Doe), 727 F.2d 1352 (4 Cir.1984). Fees are not such confidential communications and evidence of their payment is therefore properly admissible. See In re Special Grand Jury, 676 F.2d 1005, 1009 (4 Cir.), vacated on other grounds, 697 F.2d 112 (4 Cir.1982) (in banc). It is true that In re Special Grand Jury, 676 F.2d at 1009, relying upon United States v. Hodge & Zweig, 548 F.2d 1347, 1353 (9 Cir.1977), appeared to recognize an exception to the no privilege rule where "a strong probability exists that disclosure of such information would implicate that client in the very criminal activity for which legal advice was sought." But that holding was displaced by our in banc order, 697 F.2d 112, and Hodge & Zweig may no longer be good law in the Ninth Circuit. See In re Osterhoudt, 722 F.2d 591, 593 (9 Cir.1983). Certainly its purported teaching has been rejected by other circuits. See In re Shargel, 742 F.2d 61 (2 Cir.1984); In re Witnesses Before Special March 1980 Grand Jury, 729 F.2d 489, 494 (7 Cir.1984); In re Grand Jury Investigation, 723 F.2d 447 (6 Cir.1983), cert. denied, --- U.S. ----, 104 S.Ct. 3524, 82 L.Ed.2d 831 (1984); In re Freeman, 708 F.2d 1571, 1575 (11 Cir.1983). Additionally, the truly damaging aspect of the attorney's testimony related to fees paid by King, Ricks and Meredith for others. In these instances they were not clients and had no privilege.
 
 
 35
 Second, King was given the opportunity to call the lawyer and to examine him. When he failed to do so, he cannot claim that he was denied his right of cross-examination and confrontation.
 
 
 36
 Third, we do not think that Ricks' claim of a conflict of interest is meritorious. The record discloses that he joined in the stipulation, and the attorney was not called as a witness. Hence he was not faced with the unseemly and ineffective position of arguing his own credibility.
 
 
 37
 The conflict cases on which Ricks relies all involve representation of multiple defendants by one or two lawyers. They are inapposite here. Ricks was his lawyer's only client at trial, and the fact that the lawyer's records had been subpoenaed over his objection and would be introduced at trial does not suggest that the lawyer was less than zealous and loyal in his representation of Ricks. Neither Ricks nor his lawyer objected to the lawyer's continuing role in the trial.
 
 
 38
 We therefore conclude that Ricks has no just cause for complaint. We caution, however, that the case would be entirely different if the lawyer had been called as a witness. In that event, ethical considerations as well as the rules of the district court would have prevented him from continued representation of Ricks. We suggest therefore that before a new trial begins, the district court should ascertain if King will now join in the stipulation or, if not, if he will assure the court that the lawyer will not be called as a witness. Absent joinder in the stipulation or such assurance, the district court should give careful consideration to severance of King's trial or disqualification of the lawyer as trial counsel.
 
 
 39
 F. We do not think that the issue of King's identification was so central to the case against him or that the evidence of identification was so weak that the district court abused its discretion in declining to give the instructions based upon United States v. Holley, 502 F.2d 273 (4 Cir.1974), which King requested.
 
 
 40
 G. As to defendant Frisby, we see no error in the admission into evidence of firearms seized on July 14, 1981 after a shootout between rival drug organizations over Frisby's objections that he was not present at that incident and there was no evidence that he ever owned or possessed a gun. Frisby was tried as a co-conspirator and evidence admissible against a member of the conspiracy was admissible against him. We have held that evidence of firearms is admissible in narcotics conspiracy cases. See United States v. Collazo, 732 F.2d 1200, 1206 (4 Cir.1984), cert. denied, --- U.S. ----, 105 S.Ct. 777, 83 L.Ed.2d 773 (1985).
 
 
 41
 REVERSED AND REMANDED.
 
 WILKINSON, Circuit Judge, dissenting:
 
 42
 The majority suggests that "it was not unreasonable for defense counsel to have enough certainty in their interpretation of the court's remarks to negate any duty on their part to make a further inquiry or to request clarification." Ante at 460. I disagree. Given the ambiguities in the court's statement, the lack of federal or local rules to justify deductive assumptions about jury selection, and the importance of exercising peremptory challenges intelligently, it was unreasonable at trial for defense counsel to gamble without a clarifying inquiry on the accuracy of their impression that the jury would be chosen from the first thirty names on the venire list. And it is now unreasonable on appeal for this court to excuse that gamble and to redeem an attorney error by liquidating the large economic and personal investment in a complicated five-week trial. Because I believe that the defendants received a fair trial, in the selection of the jury and in all other respects, I dissent from the reversal of these convictions.
 
 
 43
 * Proper analysis of this case begins with an examination of the trial court's response to the prosecutor's inquiry about the then imminent jury selection. The majority's contrary assertion that it need not determine if "the district court did or did not positively tell counsel that it would select active jurors from the top of the list," ante at 460, begs the question. The exchange between court and counsel is crucial because it helps to resolve the decisive issue on appeal: whether a reasonable attorney would have requested clarification before basing all peremptory challenges on the principle that informed the strikes of these defendants.
 
 
 44
 In eschewing an examination of how positively the trial court spoke and in pointing to the undisputed good faith of defense counsel, the majority addresses this appeal in part by asking whether, or in what sense, the lawyers actually understood the proposed method of jury selection. Such a "subjective" approach to the dispute suffers in a heightened degree from the problems that are often associated with the similar interpretation of contracts--the difficulty of ascertaining a party's innermost thoughts and the disingenuousness of characterizing law as a realization of consent rather than as an imposition of forms and obligations. See A. Corbin, Corbin on Contracts Sec. 106. These disadvantages of the subjective approach are further magnified by the failure here of the usual objections to the rival "objective" method. In a courtroom, perhaps more than any other place, words may be held to precise meanings, parties may be charged with a common knowledge of those definitions, and the authorization for legal enforcement may be traced most fairly to a formal course of rulemaking rather than to an effectuation of any personal intentions. For all of these reasons, the most valuable perspective in this case is the familiar construct of the reasonable attorney and the most valuable evidence is the set of external manifestations on which that attorney would rely in exercising her peremptory challenges.
 
 
 45
 Looking through this perspective at this evidence, I believe that reasonable attorneys here would have sought amplification of the trial court's remarks before launching off on an interpretation of their own. The trial court's statement, quoted ante at 459, was definite only in declining to describe any specific method that the court intended to use to choose the jury. Asked if it would proceed from the top of the venire list, the court began its response with "Well, I can't tell at this point, as far as strikes and so forth...." This declaration of uncertainty was not withdrawn, nor was it transformed into a commitment by the court's qualifying note about previous jury selections. No particular pattern was identified or precise expectation created by the observation that "[I can't tell at this point ...] but ordinarily I start from the top, not any rigid number, counting from the top ..." (emphasis added). Finally, the court's concluding remarks were tentative, elliptical, and ambiguous, venturing only that "it would be reasonably fair to say, if you want to exercise your strikes mostly at the top, and if you're satisfied with the top, don't strike there." Far from saying what the defense counsel say they heard, this last clause suggested that counsel might want to make their challenges someplace other than at the top of the list and thereby implied an intention to choose the jury in part from someplace other than the top.
 
 
 46
 The court also conveyed the same impression by distributing to the attorneys a list of fifty-seven names on which to make their strikes. If the court had intended to confine itself to the first thirty names, it need only have given counsel a part of the full venire list. While the distribution of a longer list is not dispositive as to the court's intentions, it was an additional factor suggesting the appropriateness of a clarifying inquiry.
 
 
 47
 The court's words and actions thus provided several different signals that warned against any exclusive concentration of peremptory strikes. First, the trial court never promised to use any specific method of jury selection. Second, and conversely, the trial court expressly explained that it was uncertain about the course that it intended to take. Third, the trial court in different ways indicated that it might follow a system other than picking solely from the top of the list. A reasonable attorney would accordingly have found no predicate in the court's remarks for an effective contraction of the venire, and defense counsel acted improperly to the extent that they relied upon the ambiguous statement in making such a contraction.[1]
 
 
 48
 Nor would a reasonable attorney have reached the defense counsel's interpretation by application of any laws governing the selection of jurors from a fully qualified venire. Few such rules exist, and none of them required the trial court to choose from a minimum fraction of the eligible candidates. Although the majority today endorses such a practice, ante at p. 459, n. 4, the law since at least 1894 has been that the mode of designating and empanelling jurors lies within the control of trial courts, subject only to Congressional restriction and to "such limitations as are recognized by the settled principles of criminal law to be essential in securing impartial juries for the trial of offenses." Pointer v. United States, 151 U.S. 396, 407-08, 14 S.Ct. 410, 414, 38 L.Ed. 208 (1894).[2] The latter concern, the constitutional requirement of an impartial jury, is not relevant here. The trial court excused eight venire members for cause, all of them at the request of the defendants. On appeal the defendants allege no cognizable prejudice among the active jurors. This case does not involve a biased jury, or even an unfair transfer to the defendants of the burden of avoiding a biased jury. Cf. United States v. Allsup, 566 F.2d 68 (9th Cir.1977). The principle that a trial court must empanel an impartial jury therefore could not have suggested to counsel any particular understanding of the court's intended method of selection.
 
 
 49
 The other limitation that Pointer v. United States places on trial court discretion, that of deference to legislation and to authorized rulemaking, also would not lead a reasonable attorney to believe that the trial court intended to draw only from the first thirty names on the fifty-seven name venire list. Fed.R.Crim.P. 24(b) provides only that defendants in a felony trial may strike ten candidates from the venire.[3] The rule does not prescribe a procedure for paring the venire or define an extent to which the ten peremptory challenges must influence the eventual composition of the jury. To the contrary, jurists since Joseph Story have observed that "the right of peremptory challenge is not, of itself, a right to select, but a right to reject jurors," United States v. Marchant and Colson, 25 U.S. (12 Wheat.) 480, 482, 6 L.Ed. 700 (1827), and cases since Marchant and Colson have upheld a wide variety of methods for the exercise of strikes, methods that range not only in format but also in the substantive force that they create for peremptory challenges. See, e.g., United States v. Marchant and Colson (conflicting strikes by co-defendants); Hanson v. United States, 271 F.2d 791 (9th Cir.1959) (simultaneous exercise of challenges by prosecution and defense); United States v. Anderson, 562 F.2d 394 (6th Cir.1977) (local rule precluding challenges to previously passed jurors); United States v. Blouin, 666 F.2d 796 (2d Cir.1981) ("jury box" system requiring defendant to exercise challenge without knowing entire present composition of jury); Rosales-Lopez v. United States, 451 U.S. 182, 101 S.Ct. 1629, 68 L.Ed.2d 22 (1981) (limitations on access of counsel to voir dire inquiries that would guide exercise of challenges). Not surprisingly, courts and commentators have repeatedly remarked on this absence of settled patterns for final jury selection. United States v. Sams, 470 F.2d 751, 755 n. 1 (5th Cir.1972); United States v. Turner, 558 F.2d 535, 537 (9th Cir.1977); 2 C. Wright, Federal Practice and Procedure: Criminal Sec. 387. In the context of such notorious silence in the rules and variety in the courts, no reasonable attorney would presume to extract a certain meaning from a trial court's uncertain statement about the jury selection procedure.
 
 
 50
 And a fortiori, as law students say, no reasonable attorney would dare extract the most favorable meaning from the trial court's non-committal statement. The Federal Rules of Criminal Procedure obviously do not require that the exercise of peremptory challenges be administered in a fashion that allows defendants the greatest possible influence over the final jury composition. In the absence of any such rule, the proper interpretative attitude of counsel should be one of caution. The reasonable attorney practices in partnership with the prudent attorney. Furthermore, the usual duty of circumspection applies with special force to matters of special significance, and as the Supreme Court has noted, the entitlement to peremptory challenges is "one of the most important of the rights secured to the accused." Swain v. Alabama, 380 U.S. 202, 219, 85 S.Ct. 824, 835, 13 L.Ed.2d 759 (1965), quoting Pointer v. United States, 151 U.S. 396, 408, 14 S.Ct. 410, 414, 38 L.Ed. 208 (1894). This often-quoted characterization corresponds with the belief of many trial lawyers that cases can be won or lost on the basis of effective voir dire and peremptory challenge. See generally H. Zeisel & S. Diamond, The Effect of Peremptory Challenges on Jury and Verdict: An Experiment in a Federal District Court, 30 Stanford L.Rev. 491 (1978). The strategic potential attributed to peremptory strikes has inspired much ingenuity in the theory of determining the best use of the challenges, and the same potential should also inspire equal care in the practice of ensuring the actual preservation of the challenges. Such care would not reasonably include risking part of the value of the challenges on even a slight chance of erroneously interpreting a trial court's comment.[4]
 
 II
 
 51
 The importance of peremptory challenges explains from the viewpoint of the bar why a hint of ambiguity should alert counsel to seek further clarification before risking a particular course of selection. From the viewpoint of the bench, the same rule follows from the importance to the judicial system of prompt resolution of procedural controversies. This concern is most familiar in the context of the duty of contemporaneous objection. If a reasonable attorney cannot be sure whether the trial court is acting properly, the lawyer must usually object at that moment of court action or else forfeit the uncertain point. See, e.g., F.R.E. 103(a); Fed.R.Crim.P. 30; Wainwright v. Sykes, 433 U.S. 72, 88-90, 97 S.Ct. 2497, 5507-08, 53 L.Ed.2d 594 (1977). Similarly, if a reasonable attorney cannot be sure how the trial court is acting, the lawyer should inquire at that moment or else forfeit the uncertain point.
 
 
 52
 Here the interests served by a contemporaneous inquiry are similar to those served by the duty of contemporaneous objection. See Wainwright, 433 U.S. at 88-90, 97 S.Ct. at 2507-08; Henry v. Mississippi, 379 U.S. 443, 463, 85 S.Ct. 564, 575, 13 L.Ed.2d 408 (1965) (Harlan, J., dissenting). The trial judge can clarify the selection procedures at the outset before the time and effort of trial participants have been expended. The finality of criminal judgments would be encouraged. Sandbagging, whereby counsel forego inquiry of the court, exercise their peremptory challenges on the most favorable interpretation of an ambiguity, and then take exception when that interpretation is not followed, would be discouraged.
 
 
 53
 It would be ideal, of course, for the trial court to explain to counsel the procedure for jury selection with perfect clarity. It would be preferable if there were "local rules of court spelling out the procedure for exercising peremptory challenges in criminal cases," See United States v. Turner, 558 F.2d at 537. But desirability of reform does not relieve courts from dealing with the world that confronts us. I am not convinced that trial judges are so sensitive, trial lawyers so bashful, or relations between the two so brittle and uncommunicative that we cannot require of counsel a respectful inquiry without risking the ire or annoyance of the bench. Nor, in my judgment, are the normal obligations on government to give adequate notice of rights to criminal defendants shifted by encouraging an inquiry in the event that notice itself is, for understandable reasons, not clear.
 
 
 54
 The instant case well illustrates the interests that are served by a requirement of contemporaneous inquiry. The trial of these defendants lasted for five weeks and filled a transcript of more than four thousand pages, statistics that barely hint at the time, effort, and money that the public has invested in this case. Today the process begins again, probably at an even greater cost. Inevitably, other litigants will now be delayed or denied the use of finite judicial resources. The heavy burden thus placed on all litigants by a simple failure to communicate must be distributed through an equally heavy burden on each litigant to avoid confusion and misunderstanding. If a trial court statement admits of different meanings, and particularly as in this case of sharp ambiguity, counsel should ask the court for clarification rather than asking society to insure the risks of uncertain reliance. In holding the conduct of these defense attorneys to have been reasonable, the majority adopts a standard of behavior that does not adequately respect the important values of fairness through judicial efficiency, concerns that in our legal system must often be advanced by influencing the conduct of counsel.
 
 
 55
 I would affirm these convictions.
 
 
 
 [1]
 Originally thirteen defendants, including the eight appealing defendants, were indicted jointly. Three defendants (Hines, Williams and West) pled guilty; one (Meredith) is a fugitive; and defendant Hurt dismissed his appeal after his sentence was modified. Defendant Carter was acquitted of a substantive charge at trial. Defendants Moffatt, Lindsey and Frisby were convicted of substantive offenses in addition to the Sec. 846 conspiracy
 
 
 [2]
 Defendants during the trial and in their brief before us exhibit confusion as to how many strikes from the active jury they were given. In several instances, they claim that they were given thirteen strikes but only exercised twelve. The transcript reflects that they were given only twelve. That is the figure used by the government in its brief
 The difference between twelve and thirteen is not significant in this case because the fact is that defendants exercised none of their strikes in the portion of the list of veniremen from which the jury was selected.
 
 
 [3]
 The district court explained the mechanics of exercising the peremptory challenges of alternate jurors by stating "we'll take the last eight names on the list for our alternates and the defendants jointly will take two strikes against that and the government will take two, and that will leave four alternates."
 
 
 [4]
 If defendants' jury were the only jury to be selected, fewer veniremen would have been required, viz
 
 
 [12]
 - main jury
 
 
 [4]
 - alternate jurors
 
 
 [12]
 - defendants' peremptory challenges
 
 
 [6]
 - government's peremptory challenges
 
 
 [4]
 - total peremptory challenges to alternate jurors
 --
 
 
 [38]
 
 Some additional veniremen would have been required to allow for challenges for cause, but after the ten such challenges in this case, there were still twenty-seven extra veniremen. Thus the actual venire was over 50% larger than necessary. Our decision in this case does not rest on the total size of the venire, but on the absence of effective notice of how actual jurors would be chosen. We note, however, that an excessively large venire could have the same effect that we condemn in this case, even if the procedure were clearly explained. The usual practice with a struck jury system, which we encourage, is for the list to contain only the approximate number of necessary potential jurors. See, e.g., United States v. Blouin, 666 F.2d 796, 796-97 (2 Cir.1981); United States v. Morris, 623 F.2d 145, 151-52 (10 Cir.), cert, denied, 449 U.S. 1065, 101 S.Ct. 793, 66 L.Ed.2d 609 (1980). A much larger pool may be necessary to begin with, but after enough veniremen have passed voir dire without successful challenge for cause, there is no reason why the list may not be pared down to the necessary size, which in this case would have been thirty-eight.
 
 
 [5]
 The punctuation of a transcript is ordinarily a matter left to the discretion and usage of the court reporter. It occurs to us that the thought that the district court would select jurors from the top of the list would be more positively conveyed by the written record were an additional comma inserted in the latter part of the court's statement:
 so I think it would be reasonably fair to say, if you want, to exercise your strikes mostly at the top, and if you're satisfied with the top, don't strike there.
 
 
 [6]
 As counsel succinctly stated "[r]ather than strike the worst 12 as we saw them, we struck the worst 12 in the order from the first number."
 
 
 [7]
 One of the two was the foreman selected by the court. Counsel said: "We decided not to strike him because we felt that coming [counting?] from the first, from the top of the list, he would not be possibly called, even if the Government took six strikes and we took twelve, we wouldn't get to this gentlemen that is now the foreman."
 
 
 [8]
 Well, the objection will be overruled and we'll swear the jury, and you have an exception, of course, to that ruling
 It seems to me the Government followed my instructions. If counsel misunderstood them, I think that is unfortunate. I don't think that you can say the strikes were not effective because it could have been that I would have picked one of these people that you struck as the foreman. I don't know anything about any of these people. I don't think counsel does either, but at this point, to say, "We don't like the composition of the jury and therefore we ought to pick another jury because we think those people are going to be one way or the other," I don't think is the proper way to do it and I think that the Government properly followed my instructions. Defense counsel didn't. So your exceptions will be noted and we're going to swear the jury.
 
 
 [9]
 While we find no precedent precisely in point, we think that our holding is in accord with general propositions reflected in the weight of authority. See United States v. Turner, 558 F.2d 535 (9 Cir.1977) ("[a]mbiguous exchanges that led to misunderstandings between the court and counsel about the district court's own ground rules" became automatic reversible error when defendant was not given adequate notice of the system to be used and his use of peremptories was restricted); United States v. Sams, 470 F.2d 751 (5 Cir.1972) (defense counsel was "predictably misled" by a question from the clerk and surprised when accurately informed of the system being used; serious limit on full, unrestricted exercise of peremptories constituted plain and reversible error); United States v. Rucker, 557 F.2d 1046 (4 Cir.1977) (defendant must have meaningful opportunity to exercise peremptory challenges; district court's erroneous refusal to excuse a juror for cause constitutes reversible error because the number of peremptory challenges available to the defense was effectively reduced when defendant was forced to use a peremptory to strike that juror); United States v. Allsup, 566 F.2d 68, 71 (9 Cir.1977) (same as Rucker ); United States v. Nell, 526 F.2d 1223, 1229 (5 Cir.1976) ("[A]s a general rule it is error for a court to force a party to exhaust his peremptory challenges on persons who should be excused for cause, for this has the effect of abridging the right to exercise peremptory challenges."); Spencer v. State, 20 Md.App. 201, 314 A.2d 727 (1974) (denial of due process for clerk, after defense had exercised all peremptories, suddenly to skip down the list of prospective jurors rather than to continue to proceed in order from the top); cf. Hines v. Enomoto, 658 F.2d 667 (9 Cir.1981) (misleading statement by clerk that effectively denied half of peremptories allowed by state law could form the basis for federal habeas relief); Carr v. Watts, 597 F.2d 830 (2 Cir.1979) (in a civil case, forced waiver of one peremptory was a direct impairment of a statutory right and thus automatic reversible error)
 While we decide this case on the basis of what counsel may reasonably (measured by an objective, and not a subjective, standard) have understood the district court to mean, we are not unmindful that some of these authorities, particularly United States v. Turner, supra, hold or strongly suggest that, absent a local rule of court or established local practice about how a jury will be selected and how peremptory strikes should be exercised with respect to a large venire, there is a duty on the part of the court to give clear, unambiguous instructions to counsel about the procedure to be followed and that a failure on the part of the court in this respect is plain error. This line of authority would be fully applicable here because there is little doubt that there was ambiguity in what the court said. Under this line of authority, an objection by counsel is unnecessary to preserve the issue for appeal.
 
 
 [10]
 The argument is advanced solely by Ricks, but since the issue is likely to recur on retrial, we address it as it applies to both Ricks and King
 
 
 [11]
 See Jeffers v. United States, 432 U.S. 137, 149-50, 157, 97 S.Ct. 2207, 2215-16, 2219, 53 L.Ed.2d 168 (1977) (four-Justice plurality) ("For the purposes of this case, therefore, we assume, arguendo, that ... Sec. 846 is a lesser included offense of Sec. 848"; "Congress did not intend to impose cumulative penalties under Secs. 846 and 848."); id. at 159, 97 S.Ct. at 2220 (four-Justice concurrence in vacation of cumulative fines). Garrett distinguished Jeffers without purporting to affect its result, --- U.S. at ----, 105 S.Ct. at 2419, although its affirmance of cumulative sentences and fines for the conspiracy and CCE counts is directly contrary to Jeffers
 
 
 [12]
 Several other courts of appeals before Garrett were in accord with our precedents, see United States v. Gomberg, 715 F.2d 843, 851 (3 Cir.1983), cert. denied, Levy v. U.S., 465 U.S. 1078, 104 S.Ct. 1440, 79 L.Ed.2d 760 (1984); United States v. Jefferson, 714 F.2d 689, 701-03 (7 Cir.1983); United States v. Middleton, 673 F.2d 31, 33 (1 Cir.1982); United States v. Chagra, 669 F.2d 241, 261-62 (5 Cir.), cert. denied, 459 U.S. 846, 103 S.Ct. 102, 74 L.Ed.2d 92 (1982), while several others had held that cumulative punishments could be imposed for violations of Secs. 841 and 848, see United States v. Darby, 744 F.2d 1508, 1530 (11 Cir.1984), cert. denied, --- U.S. ----, 105 S.Ct. 2322, 85 L.Ed.2d 841 (1985); United States v. Brantley, 733 F.2d 1429, 1436-37 (11 Cir.1984), cert. denied, --- U.S. ----, 105 S.Ct. 1362, 84 L.Ed.2d 383 (1985); United States v. Mourad, 729 F.2d 195, 203 (2 Cir.1984), cert. denied, --- U.S. ----, 105 S.Ct. 2700, 86 L.Ed.2d 717 (1985); United States v. Phillips, 664 F.2d 971, 1009 (5 Cir.1981), cert. denied, 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982); cf. United States v. Oberski, 734 F.2d 1030, 1033 (5 Cir.1984) (separate conviction and punishment for Sec. 841 violation permissible if not actually relied on in establishing CCE); United States v. Chagra, 653 F.2d 26, 31-32 (1 Cir.1981) (same), cert. denied, 455 U.S. 907, 102 S.Ct. 1252, 71 L.Ed.2d 445 (1982); United States v. Samuelson, 697 F.2d 255, 260 (8 Cir.1983) (same), cert. denied, 465 U.S. 1038, 104 S.Ct. 1314, 79 L.Ed.2d 711 (1984). We presume that the latter group will prevail after Garrett
 
 
 [13]
 The Supreme Court's opinion in Garrett referred to the "three predicate offenses that must be shown to make out a CCE violation," --- U.S. at ----, 105 S.Ct. at 240, and to "the three predicate offenses required to form the basis for a continuing criminal enterprise prosecution," id. at ----, 105 S.Ct. at 2417. See also id. at ---- & n. 19, 105 S.Ct. at 2424 & n. 19 (Stevens, J., dissenting) (assuming that "continuing series" means at least three felony violations). Most of the other courts of appeals have so held. See United States v. Sterling, 742 F.2d 521, 526 (9 Cir.1984), cert. denied, --- U.S. ----, 105 S.Ct. 2322, 85 L.Ed.2d 840 (1985) United States v. Sinito, 723 F.2d 1250, 1261 (6 Cir.1983), cert. denied, --- U.S. ----, 105 S.Ct. 86, 83 L.Ed.2d 33 (1984); United States v. Graziano, 710 F.2d 691, 697 n. 11 (11 Cir.1983), cert. denied, --- U.S. ----, 104 S.Ct. 1910, 80 L.Ed.2d 459 (1984); United States v. Samuelson, 697 F.2d 255, 259 (8 Cir.1983), cert. denied, 465 U.S. 1038, 104 S.Ct. 1314, 79 L.Ed.2d 711 (1984); United States v. Losada, 674 F.2d 167, 174 n. 4 (2 Cir.), cert. denied, 457 U.S. 1125, 102 S.Ct. 2945, 73 L.Ed.2d 1341 (1982); United States v. Phillips, 664 F.2d 971, 1013 (5 Cir.1981), cert. denied, 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982); United States v. Chagra, 653 F.2d 26, 27-28 (1 Cir.1981), cert. denied, 455 U.S. 907, 102 S.Ct. 1252, 71 L.Ed.2d 445 (1982); United States v. Johnson, 575 F.2d 1347 (5 Cir.1978), cert. denied, 440 U.S. 907, 99 S.Ct. 1213, 59 L.Ed.2d 454 (1979)
 
 
 [14]
 United States v. Webster, 639 F.2d 174, 181 (4 Cir.1981), modified on other grounds, 669 F.2d 185 (4 Cir.), cert. denied, 456 U.S. 935, 102 S.Ct. 1991, 72 L.Ed.2d 455 (1982)
 
 
 [15]
 E.g., United States v. Sterling, 742 F.2d 521, 526-27 (9 Cir.1984), cert. denied, --- U.S. ----, 105 S.Ct. 2322, 85 L.Ed.2d 840 (1985); United States v. Brantley, 733 F.2d 1429, 1436-37 (11 Cir.1984), cert. denied, --- U.S. ----, 105 S.Ct. 1362, 84 L.Ed.2d 383 (1985)
 
 
 [16]
 We have previously stated in dicta that a Sec. 846 conspiracy may not be used to prove the predicate violation required by Sec. 848(b)(1), Lurz, supra, 666 F.2d at 76; accord United States v. Jefferson, 714 F.2d 689, 702 n. 27 (7 Cir.1983); but see United States v. Young, 745 F.2d 733, 748-52 (2 Cir.1984), cert. denied, --- U.S. ----, 105 S.Ct. 1842, 85 L.Ed.2d 142 (1985); United States v. Brantley, 733 F.2d 1429, 1436 n. 14 (11 Cir.1984), cert. denied, --- U.S. ----, 105 S.Ct. 1362, 84 L.Ed.2d 383 (1985); United States v. Middleton, 673 F.2d 31, 33 (1 Cir.1982); cf. United States v. Michel, 588 F.2d 986, 1000-01 (5 Cir.) (no opinion on issue), cert. denied, 444 U.S. 825, 100 S.Ct. 47, 62 L.Ed.2d 32 (1979), but we have also held that a distinct conspiracy may be used to prove the "series" and other requirements of Sec. 848(b)(2). Lurz at 76-77. Garrett seems to support us on the latter point and to allow the government at least to count a Sec. 846 violation as one of the three necessary for a series. The Garrett Court did not focus on the identity of the necessary predicate offenses, but Garrett was convicted of only two substantive violations and two conspiracy counts, so affirmance indicates that conspiracy violations may constitute a necessary part of the required series. Cf. United States v. Darby, 744 F.2d 1508 (11 Cir.1984) (convictions affirmed where one defendant convicted of two substantive offenses and CCE and other convicted of only two conspiracies and CCE charge), cert. denied, --- U.S. ----, 105 S.Ct. 2322, 85 L.Ed.2d 841 (1985); United States v. Bascaro, 742 F.2d 1335 (11 Cir.1984) (after court vacated Sec. 846 and Sec. 963 conspiracy convictions, only two substantive Sec. 841 violations remained for defendant Villanueva), cert. denied, --- U.S. ---- 105 S.Ct. 3477, 87 L.Ed.2d 613 (1985)
 
 
 [17]
 Lurz stated that "[i]t is simply incorrect for [defendants] to contend that a minimum of three substantive convictions is required to establish a Sec. 848 violation." 666 F.2d at 78 (emphasis added). See also United States v. Young, 745 F.2d 733, 747 (2 Cir.1984), cert. denied, --- U.S. ----, 105 S.Ct. 1842, 85 L.Ed.2d 142 (1985); United States v. Sterling, 742 F.2d 521, 526 (9 Cir.1984), cert. denied, --- U.S. ----, 105 S.Ct. 2322, 85 L.Ed.2d 840 (1985); Sperling v. United States, 692 F.2d 223, 226 (2 Cir.1982), cert. denied, 462 U.S. 1131, 103 S.Ct. 3111, 77 L.Ed.2d 1366 (1983); cf. United States v. Brantley, 733 F.2d 1429, 1436 n. 14 (11 Cir.1984) (unnecessary to decide issue because defendant convicted on enough counts), cert. denied, --- U.S. ----, 105 S.Ct. 1362, 84 L.Ed.2d 383 (1985); United States v. Gomberg, 715 F.2d 843, 850 n. 4 (3 Cir.1983) (same), cert. denied, 465 U.S. 1078. 104 S.Ct. 1440, 79 L.Ed.2d 760 (1984); United States v. Michel, 588 F.2d 986, 1000 n. 15 (5 Cir.) (same), cert. denied, 444 U.S. 825, 100 S.Ct. 47, 62 L.Ed.2d 32 (1979). King did not raise any objection in the district court to the structure of the CCE charge against him, so the government did not rely on this argument, and accordingly we do not decide whether the government's proof met this test
 
 
 [1]
 It is worth note that at least one reasonable attorney did not share the defense counsel's interpretation of the court's statement. The prosecutor apparently first assumed that the court would select the jury from the top of the venire list. He properly sought confirmation of this assumption, and when the court responded to his inquiry he interpreted the statement to mean that the court would choose from the entire venire
 
 
 [2]
 A trial court might also control its own discretion by promulgating a local rule. The appellants do not argue that any such local rule existed or was violated in this case. The situation is therefore different from United States v. Sams, 470 F.2d 751, 752 (5th Cir.1972) (peremptory challenges impermissibly compromised when "without prior announcement to counsel the trial judge utilized a method of selecting a jury that varied from the local custom")
 
 
 [3]
 The trial court in this case granted the defendants two additional challenges, which made a total of twelve
 
 
 [4]
 These defendants did enjoy part of the value of their challenges despite the confusion that resulted in this appeal, for the final jury included none of the venire members whom the defense counsel struck. The majority assumes that the district court never considered these candidates; an equally fair assumption is that the district court might have chosen the candidates but for the fact that they were rejected by defense counsel. The court's own statement supports the latter assumption; it noted that it might have "picked one of those people that you struck as the foreman."